CONNECTICUT BANK AND TRUST COMPANY, N.A. *v.*
VICTOR INCENDY ET AL.
(13092)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued December 2, 1987—decision released April 5, 1988

*Ross G. Fingold,* with whom, on the brief, were *Leonard M. Bieringer* and *Edward C. Taiman, Jr.,* for the appellant (plaintiff).

*William F. Gallagher,* with whom, on the brief, was *Evelyn A. Barnum,* for the appellees (named defendant et al.).

CALLAHAN, J. The plaintiff, Connecticut Bank and Trust Company, N.A. (CBT), filed the instant appeal from a judgment of the trial court, *Lewis, J.,* rendered in accordance with the findings and report of an attorney state trial referee, *Isadore M. Mackler.* The appeal was transferred from the Appellate Court to this court, pursuant to Practice Book § 4023. It presents two interrelated issues of first impression for this court. First, whether notice given by a creditor to a debtor of a public sale of repossessed collateral which complies with General Statutes § 42a-9-504 (3) is sufficient notice for a subsequent private sale of the same collateral after

the public sale has proven unsuccessful.[1] Second, if notice of the sale is not sufficient, what is the effect of such insufficiency on the right of a creditor to obtain a deficiency judgment.

The relevant facts are not in dispute. On June 5, 1974, Connecticut Electric Products, Inc. (CEP), a manufacturer of plastic injected molded products, executed a promissory note in the amount of $103,500, which was made payable to CBT. To secure the note, CEP gave the bank security interests in CEP's inventory, accounts receivable, and machinery and equipment. As part of the financing arrangement, Victor Incendy and Jeanette Incendy, who were the officers and sole owners of the capital stock in CEP, personally executed a written guaranty to the bank guaranteeing payment of the note and all other moneys advanced to CEP by CBT.[2] To secure the note and as part of their

---

[1] General Statutes § 42a-9-504 (3) provides: "SECURED PARTY'S RIGHT TO DISPOSE OF COLLATERAL AFTER DEFAULT; EFFECT OF DISPOSITION. . . .

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received, before sending his notification to the debtor or before the debtor's renunciation of his rights, written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

[2] Subsequent to the execution of the promissory note and the guaranty, CBT advanced the additional sums of $6000 on July 23, 1974, and $10,000 on September 13, 1974, to CEP. There is no dispute that these sums were covered by the Incendys' guaranty.

guaranty, the Incendys executed a mortgage deed to the bank on real estate they owned in Norwalk. The mortgage deed was recorded in the Norwalk land records on June 7, 1974.

On June 5, 1974, the same day CEP executed the promissory note, CBT entered into an agreement with Thomas Industries, Inc. (Thomas), a company experienced in liquidating heavy machinery and equipment. Thomas agreed that, in the event of a default by CEP, it would pay to CBT not less than $145,000, minus amounts due to prior lienholders, in return for the right to dispose of the collateral in accordance with the Uniform Commercial Code.[3]

Soon thereafter, CEP defaulted on the note. In November, 1974, CBT took possession of the collateral by a peaceable entry onto CEP's premises and contacted Thomas to effect its disposition. Thomas made arrangements for a public auction of the collateral to be held on January 25, 1975, on CEP's premises and publicly advertised the auction in a trade publication and by circulating brochures within the trade. The Incendys were given proper notice of the public auction and, in fact, attended. All of CEP's machinery and equipment were sold at the auction with the exception of one injection plastic molding machine and three horizontal molding presses. These four machines were withdrawn from the auction block allegedly because the bids received were insufficient to pay prior liens held by the Pennwalt Corporation and ITT Industrial Credit, Inc.[4] The total proceeds realized from the public auction were $46,585.

---

[3] The amount was originally $150,000 but was changed by agreement to $145,000.

[4] In March, 1975, CBT paid to Pennwalt Corporation and ITT Industrial Credit, Inc., a total of $92,585.81 to satisfy their liens on the four machines. In return, Pennwalt Corporation and ITT Industrial Credit, Inc., assigned their interests to CBT. Thus CBT obtained first lienholder status in these machines.

Sometime after January 25, 1975, Thomas shipped the four unsold machines on consignment to the Gavlick Machinery Corporation (Gavlick), a used machinery dealer located in Bristol, for resale. The first time CBT became aware of the transfer to Gavlick was on April 8, 1975, when it received an accounting from Thomas indicating that two of the four machines had been sold for a total of $41,500.[5] CBT was informed that the remaining two machines had been sold for a total of $64,500 when it received a final report and accounting from Thomas in February, 1976. It is undisputed that the defendants did not receive any notice from CBT that the four machines had been sent to Gavlick for resale nor did they receive notice of a time after which the machines would be sold. The defendants did not know that a final disposition of the machinery had occurred until after CBT had initiated this lawsuit.

On December 18, 1979, CBT first made a written demand on the Incendys to pay the balance due and owing on the note which they had personally guaranteed. The defendants failed to honor the demand and CBT instituted this action on November 17, 1981,[6] seeking to obtain a deficiency judgment against the Incendys and to foreclose its mortgage on their Norwalk real estate. In response, the defendants asserted, inter alia, a two count special defense of equitable recoupment.[7] Count one alleged that CBT had wrong-

---

[5] In the accounting, Thomas also informed CBT that it desired to sell the remaining two machines prior to January 1, 1976, due to a slump in the market for injection molding machines caused by the oil embargo.

[6] CBT took no action between December 18, 1979, and November 17, 1981, because it was awaiting the results of a prior foreclosure action in which it had been cited because of its mortgage on the Incendys' real estate.

[7] The defendants also pleaded, as a special defense, the running of the six year statute of limitations. This defense was denied by CBT and was not pressed below. The trial referee deemed the defense to have been abandoned and neither party has raised this issue on appeal.

fully misrepresented and concealed the actual date of the defendants' default. Count two alleged that CBT had failed to comply with the Uniform Commercial Code in that it had failed to provide the defendants with reasonable notice of the sale of the machines, and to dispose of the collateral in a commercially reasonable manner. The defendants also filed a counterclaim that asserted the same allegations as count one of their equitable recoupment special defense.

The matter was tried before an attorney state trial referee. The referee's report contained extensive and detailed findings of fact, which the parties do not dispute, and was accompanied by a nineteen page memorandum of decision. The referee recommended that judgment enter for CBT on the defendants' counterclaim, and that judgment enter for the defendants on CBT's complaint.[8] With regard to CBT's action, the referee found that it had failed to comply with the notice requirements of General Statutes § 42a-9-504 (3) regarding the private sale of the four machines remaining unsold after the public auction. The referee further found that the private sale had not been conducted in a commercially reasonable manner and the amount received at the sale was therefore presumed to equal the balance of the debt owed, thus denying CBT a deficiency judgment.

Thereafter, the trial court, *Lewis, J.,* adopted the findings and recommendations of the trial referee and rendered judgment in accordance therewith. On appeal, CBT challenges the trial court's rulings that the notice of the private sale was insufficient, and that the private sale was held in a commercially unreasonable manner. We find no error.

---

[8] The defendants have not appealed the rendering of the judgment for plaintiff on their counterclaim.

## I

The first issue raised by CBT is whether the court erred in holding that the notice of the public sale was insufficient for purposes of the subsequent private sale of the collateral by Gavlick. It argues generally that notice of the unsuccessful public sale was sufficient notice for the subsequent private sale of the debtor's collateral because it complied with the "Letter and Spirit of the Uniform Commercial Code." We disagree.

The rights of a creditor or secured party to take possession of collateral after default and to dispose of it in a commercially reasonable manner are specifically provided for under the Uniform Commercial Code of this state. See General Statutes §§ 42a-9-503 and 42a-9-504 (1). Prior to disposition, however, the code specifically requires that "[u]nless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or *reasonable notification* of the time after which *any private sale* or other intended disposition is to be made *shall* be sent by the secured party to the debtor. . . ." (Emphasis added.) General Statutes § 42a-9-504 (3). It is thus clear from a reading of § 42a-9-504 (3) that a debtor must be given reasonable notice of "any private sale," and not just private sales that occur in the absence of a prior unsuccessful public sale of the same collateral. CBT does not dispute the fact that no notices of the sales by Gavlick were ever given. Rather, it argues that proper notice of the public auction constituted sufficient notice of the subsequent private sale.

Although this court has not previously addressed this issue, two lower courts in Connecticut have, as have the courts of a number of other jurisdictions. The cases of *Hertz Commercial Leasing Corporation* v. *Dynatron, Inc.,* 37 Conn. Sup. 7, 427 A.2d 872 (Super. Ct. 1980),

and *Savings Bank of New Britain* v. *Booze,* 34 Conn. Sup. 632, 382 A.2d 226 (App. Sess. 1977), both involved the repossession and subsequent disposition of collateral by a creditor after the debtor's default. In each of those cases the creditor notified the debtor that the collateral would be sold at a public sale that would be held at a specified time, date and place. In *Savings Bank of New Britain* v. *Booze,* supra, 632–33, the creditor withdrew the collateral, an automobile, from the auction block because the bids received were insufficient. In *Hertz Commercial Leasing Corporation* v. *Dynatron, Inc.,* supra, 9, the collateral was not sold at auction for reasons not apparent in the decision. Nevertheless, in each case the collateral was subsequently sold by the creditors without providing additional notice to the debtors. In both cases the courts held that the respective creditors had failed to comply with the notice requirements of § 42a-9-504 (3) because they had failed to give the debtors specific notice of the subsequent private sales. *Hertz Commercial Leasing Corporation* v. *Dynatron, Inc.,* supra, 12; *Savings Bank of New Britain* v. *Booze,* supra, 635–36.

This view is unanimously supported by the decisions of other jurisdictions that have addressed the issue in factually similar situations. In each case noted, the court held that the creditor's failure to have given notice of a subsequent private sale of unauctioned collateral amounted to noncompliance with the notice requirements of § 9-504 (3) of the Uniform Commercial Code, despite the fact that the debtor had received proper notice of a prior unsuccessful public sale. See *In re Lucas,* 28 Bankr. 366, 370 (S.D. Ohio 1982); *Randolph* v. *Franklin Investment Co.,* 368 A.2d 1151, 1155–56 (D.C. 1977); *Staley Employee Credit Union* v. *Christie,* 111 Ill. App. 3d 165, 167–68, 443 N.E.2d 731 (1982); *National Boulevard Bank of Chicago* v. *Jackson,* 92 Ill. App. 3d 928, 930, 416 N.E.2d 358 (1981);

*Spillers* v. *First National Bank of Arenzville,* 81 Ill. App. 3d 199, 204–205, 400 N.E.2d 1057 (1980). The basic rationales for these holdings are that (a) the mandatory nature of the notice provisions of § 9-504 (3) of the Uniform Commercial Code require that when a creditor *elects* the remedy of repossession and subsequent sale, it is the creditor's obligation to notify the debtor and it is the creditor's burden to establish the reasonableness of such notice, and (b) the notice provisions were specifically adopted for the benefit of the debtor, to protect the debtor's interest in his statutory right to redeem the collateral, thereby helping to ensure that the best possible price will be obtained for the collateral, that the sale will be conducted in a commercially reasonable manner, and that the debtor will immediately be placed on notice of the possibility of a deficiency for which he may ultimately be held liable.

CBT contends, however, that in this instance, the notice of the public sale complied with the notice requirements of § 42a-9-504 (3) regarding a private sale because it gave the defendants "notification of the time after which" the collateral was to be disposed. This identical argument was specifically rejected in *Staley Employee Credit Union* v. *Christie,* supra. There the court held: "Notice of a public sale to take place on [a specific date], at [a specific time], and at a particular place is *not* notice 'of the time after which a private sale or other intended disposition is to be made.' "Id., 167. It has also been held that simply making a debtor aware of an impending sale of its collateral at some time in the future is not sufficient notice of a private sale. See *In re Lucas,* supra; *Colorado Leasing Corporation* v. *Borquez,* 738 P.2d 377, 379 (Colo. App. 1986); *Spillers* v. *First National Bank of Arenzville,* supra, 202–203.

We think that this view accords with the purposes of the notice provisions of the Uniform Commercial

Code. Accordingly, we find that CBT did not comply with § 42a-9-504 (3) when it failed to provide a separate notice to the debtors of the private sales by Gavlick of the collateral in question.

## II

CBT next claims that, despite the absence of a proper notice, the sales of the four machines were, nevertheless, conducted in a commercially reasonable manner, thus entitling it to a deficiency judgment. Specifically, it argues that the sales by Gavlick were commercially reasonable because: (1) CBT made a good faith attempt to dispose of the collateral to the parties' mutual best advantage; (2) the collateral was sold through recognized dealers; and (3) the price obtained for the four machines exceeded the amounts bid at the public auction. These arguments assume that CBT is entitled to a deficiency judgment despite its failure to comply with the notice requirements of the code.

As indicated in the state trial referee's proposed memorandum of decision, there are three divergent views regarding the right to recover a deficiency judgment when the creditor fails to provide the required notice for the disposition of the collateral. These three lines of authority were most recently reviewed in the Connecticut Superior Court decision of *Tennant Co.* v. *Martin's Landscaping, Inc.,* 40 Conn. Sup. 475, 480–83, 515 A.2d 665 (1986). The three views are characterized as (1) the set-off rule, (2) the absolute bar rule, and (3) the rebuttable presumption rule. Id.

Under the set-off rule, a minority view, a secured party who fails to give notice to the debtor as required by § 42a-9-504 (3) may, nevertheless, obtain a deficiency judgment subject to a reduction or set-off under General Statutes § 42a-9-507 (1) for any loss suffered by the debtor as a result of the secured party's failure to

comply with the code.[9] Id., 482. Under this rule, it is the debtor's burden to show that a violation of the code has occurred and that a loss resulted therefrom. See *Mercantile Financial Corporation* v. *Miller*, 292 F. Sup. 797, 801 (E.D. Pa. 1968); *Valley Mining Corporation, Inc.* v. *Metro Bank*, 383 So. 2d 158, 163–65 (Ala. 1980); *McIlroy Bank & Trust* v. *Seven Day Builders*, 1 Ark. App. 121, 130, 613 S.W.2d 837 (1981); *Wilmington Trust Co.* v. *Conner*, 415 A.2d 773, 777 (Del. Super. 1980); *Crowder* v. *Allied Investment Co.*, 190 Neb. 487, 490, 209 N.W.2d 141 (1973); see also J. White & R. Summers, Uniform Commercial Code (2d Ed.) § 26-15, p. 1133 n.188; 10 A.L.R.4th 432, 432–37, § 5; 1A M. Bender, Uniform Commercial Code Service, Secured Transactions § 8.06 [2], p. 8-122 n.12. It does not seem

---

[9] General Statutes § 42a-9-507 (1) and (2) provide: "SECURED PARTY'S LIABILITY FOR FAILURE TO COMPLY WITH THIS PART. (1) If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price.

"(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."

just, however, to require the debtor to prove that he suffered a loss when it was the creditor who failed to adhere to the code.

The absolute bar rule holds that a secured party who fails to comply strictly with the notice provisions of the code is absolutely barred from recovering a deficiency judgment even when the disposition of the collateral was otherwise made in a commercially reasonable manner. *Tennant Co.* v. *Martin's Landscaping, Inc.,* supra, 480–81, and authorities cited therein; see also J. White & R. Summers, supra, § 26-15, p. 1128 nn.167–70; 1A M. Bender, supra, § 8.06 [2], pp. 8-119–8-120 n.9; 10 A.L.R.4th 420–22, § 3; 59 A.L.R.3d 409–12, § 3. These jurisdictions treat the notification requirements of § 9-504 (3) of the Uniform Commercial Code as a mandatory condition precedent to a secured creditor's right to recover a deficiency, and thus require strict statutory compliance. *Barbree* v. *Allis-Chalmers Corporation,* 250 Ga. 409, 412, 297 S.E.2d 465 (1982); *Herman Ford-Mercury, Inc.* v. *Betts,* 251 N.W.2d 492, 496 (Iowa 1977); *First National Bank of Maryland* v. *DiDomenico,* 302 Md. 290, 297, 487 A.2d 646 (1985). These jurisdictions take the view that the purposes for which the code was adopted can only be fostered by absolutely barring the recovery of a deficiency judgment unless the code is strictly complied with. See *Staley Employee Credit Union* v. *Christie,* supra, 168; *Rock Rapids State Bank* v. *Gray,* 366 N.W.2d 570, 573–74 (Iowa 1985); *DeLay First National Bank* v. *Jacobson Appliance,* 196 Neb. 398, 408–409, 243 N.W.2d 745 (1975).

In rejecting the application of the absolute bar rule, the Nebraska Supreme Court stated: "No sound policy requires us to inject a drastic punative element into a commercial context." *Cornett* v. *White Motor Corporation,* 190 Neb. 496, 501, 209 N.W.2d 341 (1973). We agree. The absolute bar rule is extremely harsh and

appears to ignore the second part of § 9-504 (3) that was also designed to protect the debtor's interests. That portion provides: "Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition* including the method, manner, time, place and terms *must be commercially reasonable.*" (Emphasis added.) Under the absolute bar rule, a disposition of collateral, conducted in the most commercially reasonable manner possible, that realized a price in excess of the existing fair market value for the collateral but less than the amount of the debt owed, would deprive the secured party of a deficiency judgment, even when such a price was obtained solely as a result of the good faith efforts of the secured party. We believe that such a result would not comport with the general purposes of article nine of the Uniform Commercial Code and would encourage debtors in default to walk away from their obligations. See *Clark Leasing Corporation* v. *White Sands Forest Products, Inc.,* 87 N.M. 451, 455, 535 P.2d 1077 (1975).

We, therefore, adopt what we think is the better view and that applied by the trial referee below and by two lower courts of this state, which is known as the "rebuttable presumption" rule. See *Tennant Co.* v. *Martin's Landscaping, Inc.,* supra, 483; *Savings Bank of New Britain* v. *Booze,* supra. Under this rule, a secured party who has failed to give proper notice to the debtor is not absolutely barred from recovering a deficiency judgment. Rather, in the absence of proper notice, a presumption arises in favor of the debtor that the collateral was worth at least the amount of the debt. The burden then shifts to the secured party to establish by a preponderance of the evidence the amount that should reasonably have been obtained through a sale conducted in accordance with the "commercially reasonable" requirements of the code. *Tennant Co.* v. *Martin's*

*Landscaping, Inc.,* supra, 481–83, and authorities cited therein; *Savings Bank of New Britain* v. *Booze,* supra; *Weiner* v. *American Petrofina Marketing, Inc.,* 482 So. 2d 1362, 1365 (Fla. 1986); *Levers* v. *Rio King Land & Investment Co.,* 93 Nev. 95, 99, 560 P.2d 917 (1977); *Clark Leasing Corporation* v. *White Sands Forest Products, Inc.,* supra, 456; see also J. White & R. Summers, supra, § 26-15, pp. 1132–33 n.187; 1A M. Bender, supra, § 8.06 [2], pp. 8-120–8-121 n.10; 10 A.L.R.4th 422, 422–32, § 4.

To meet this burden the secured party must demonstrate that each and every aspect of the sale was conducted in a "commercially reasonable" manner. See General Statutes § 42a-9-504 (3). Generally, this requires evidence of such things as the amount of advertising done, the number of people contacted, normal commercial practices in disposing of the particular collateral, the length of time between the repossession and the sale, whether any deterioration in the collateral has occurred, the number of bids received, and the price obtained. See *Farmers Equipment Co.* v. *Miller,* 252 Ark. 1092, 1099, 482 S.W.2d 805 (1972); *National Boulevard Bank of Chicago* v. *Jackson,* supra, 930; *Clark Leasing Corporation* v. *White Sands Forest Products, Inc.,* supra, 454; *Vic Hansen & Sons, Inc.* v. *Crowley,* 57 Wis. 2d 106, 113–15, 203 N.W.2d 728 (1973).

The record before this court is devoid of evidence demonstrating that the private sales by CBT through Gavlick were conducted in a commercially reasonable manner. In fact, the record lacks any evidence regarding the actual sales themselves. The only facts apparent from the record are that the four machines were

sold by Gavlick, which was a used machinery dealer, sometime between January 25, 1975, and February, 1976, for a total value of $106,000. Charles O. Poulin, the president of CBT from 1973 to 1978, testified that he did not know how, to whom, or when the four machines had been sold. In fact, he testified that he had received no notices prior to the actual sales. He only became aware of the disposition of the machinery by way of the accountings filed by Thomas Industries, Inc., in April, 1975, and February, 1976, that stated simply the amounts realized from the sales. The accountings did not specify the date of the sales, to whom the machinery was sold, or which of the four machines were sold on what occasion.

In addition, Thomas Gagliardi, the president of Thomas Industries, Inc., testified at trial that he had no knowledge of how Gavlick disposed of the collateral. The only thing he recalled was that the machines were shipped to Gavlick on consignment sometime after the public auction. Gagliardi was not even sure whether the machines had been shipped to Gavlick together or separately. It must also be noted that CBT failed to call as a witness any representatives of Gavlick to establish the details of the sales.

CBT argues that it proved that the disposition of the machines was accomplished in a commercially reasonable manner simply because they were sold through Gavlick, which was a recognized used machinery dealer. We disagree. General Statutes § 42a-9-507 (2) provides in relevant part: "If the secured party . . . has otherwise sold [the collateral] in *conformity with reasonable*

*commercial practices among dealers* in the type of property sold, he has sold in a commercially reasonable manner." (Emphasis added.) Contrary to CBT's claim, this portion of § 42a-9-507 (2) does not create an irrebuttable presumption that collateral has been disposed of in a commercially reasonable manner, where the only fact known is that the collateral was disposed of by a dealer. Rather, § 42a-9-507 (2) also requires the collateral to have been sold "in conformity with reasonable commercial practices among dealers in the type of property sold." As previously stated, CBT has presented no evidence to indicate by what method or to whom Gavlick sold the machines. Additionally, CBT failed to establish the reasonable commercial practices among used equipment dealers for the disposition of injection molding machines, or Gavlick's prior experience in disposing of machines of this type.

Accordingly, we find that the trial court did not err in holding that CBT failed to demonstrate that the private sales of the four machines had been conducted in a commercially reasonable manner as required by § 42a-9-504 (3).

Alternatively, CBT argues that the details regarding the method and manner of the private sales of the collateral are irrelevant here because the prices ultimately obtained were fair given the fact that they exceeded the amounts bid at the public sale. In addition, CBT argues that "price is the single most important factor in determining whether a section 9-504 sale has been commercially reasonable."

While the price received at the sale of the collateral is important and one of the relevant factors in determining whether the sale was commercially reasonable, alone it is insufficient to establish that the sale was commercially reasonable or to establish the reasonable

value of the collateral sold. *National Boulevard Bank of Chicago* v. *Jackson,* supra, 931; *Hall* v. *Owen County State Bank,* 175 Ind. App. 150, 163, 370 N.E.2d 918 (1977); *DeLay First National Bank & Trust Co.* v. *Jacobson Appliance,* supra, 407–408; *First National Bank of Bellevue* v. *Rose,* 188 Neb. 362, 364, 196 N.W.2d 507 (1972); *Levers* v. *Rio King Land & Investment Co.,* supra, 98; 1A M. Bender, supra, § 8.04 [2] [a], p. 8-79. Rather, " 'it is only where the sale is conducted according to the requirements of the code [i.e., commercially reasonable] that the amount received or bid at a sale of collateral is evidence of its true value in an action to recover a deficiency.' *Universal C.I.T. Credit Corporation* v. *Rone,* 248 Ark. 665, 669, 453 S.W.2d 37, 39–40 (1970)." *Hall* v. *Owen County State Bank,* supra; see also *Clark Leasing Corporation* v. *White Sands Forest Products, Inc.,* supra. In any event, the burden rests upon the secured party to establish the fair market value of the collateral at the time of the sale by presenting credible and objective evidence of the value other than the price received or the opinions of its own agents and employees. *Farmers State Bank of Leeds* v. *Thompson,* 372 N.W.2d 862, 866 (N.D. 1985), citing *State Bank of Towner* v. *Hansen,* 302 N.W.2d 760, 767 (N.D. 1981); see also *Weaver* v. *O'Meara Motor Co.,* 452 P.2d 87, 92–93 (Alaska 1969); *Hall* v. *Owen County State Bank,* supra; 59 A.L.R.3d 361, 373, 374.

In the case at hand, the only evidence CBT presented, other than the price received, was the testimony of Thomas Gagliardi, who was the president of Thomas Industries, Inc. Gagliardi testified that, in his opinion, which was based upon his knowledge and experience as an auctineer of heavy machinery and on conversations he had with the manufacturer of the machines prior to trial, the $105,000 received by Gavlick represented the "fair liquidation value" of the four machines

given the conditions that existed in the plastics industry in January, 1975.[10]

To the contrary, the defendants offered the testimony of Victor Incendy in an attempt to establish that the value of the machines was actually $175,000 to $180,000. Incendy referred to the three conditional sales contracts entered into between CEP and the Stokes Equipment Division of the Pennwalt Corporation covering CEP's purchases of the four machines in question.[11] The three sales contracts dated April 7, 1972, July 28, 1972, and March 5, 1973, respectively, indicate the following cash prices that CEP paid for the four machines: $72,600 for two 900-782-3 New Stokes Model 175H 10XL Horizontal Molding presses; $54,400 for one 900-784-7 New Stokes Model 375-H-25 Horizontal Molding press; and $49,000 for one New Stokes 300H25 Horizontal Injection Molding Machine. Thus, the total cash price CEP paid for the four machines when they were new was $176,900. Incendy also testified that, as of February, 1975, the two 900-782-3 presses, to which he made $30,000 in modifications, had a combined value of $80,000 to $90,000 and that the remaining two machines had a combined value of approximately $130,000.

In addition, Incendy also testified that in March, 1975, he purchased four other used plastic injection molding machines in pursuit of a new business and paid

[10] Gagliardi testified earlier that the plastics industry experienced a difficult period of uncertainty because of the oil embargo that occurred in 1973. Manufacturers of molding machines began to experience surpluses in their inventories of new equipment because plastics are made from petroleum which was in short supply. Gagliardi indicated that Thomas Industries, Inc., was therefore concerned about the prices it could obtain for the four machines at that time.

[11] The three contracts were attached to the Assignment Agreement executed between CBT and the ITT Industrial Credit, Inc., and Pennwalt Corporation under which CBT attained first lienholder status in the four machines by paying off the amounts owed to ITT/Pennwalt.

a total cash price of $142,000 for them. Incendy stated that these four machines were much older,[12] made by different manufacturers, and were of inferior quality to the Stokes machines because of their construction, engineering and operation, with the major difference being that one group operated hydraulically while the other group operated mechanically. At the close of his testimony, he stated that, at the time of the public auction in January, 1975, the four Stokes machines disposed of by Gavlik were worth a total of $175,000 to $180,000.

After having considered the conflicting evidence regarding the values of the machines, the trial referee held that it "was unable to determine the fair market value or the fair or reasonable value of the collateral at the time of the sale," because the opinions of Gagliardi and Incendy "were not adequately reinforced by independent evidence which would afford them sufficient weight for acceptance by the trier."[13] Consequently, the trial referee concluded that CBT had not met its burden of proof that the sales were "commercially reasonable" so as to overcome the presumption that the value of the collateral was worth at least the amount of the debt. We agree.

" 'The determination of value by a [trial] court is the expression of the court's opinion aided ordinarily by the opinions of expert witnesses, and reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value and its own general knowledge of the elements going to establish it.' [Cita-

---

[12] One machine was made in 1954, the other three in the 1960s.

[13] The attorney state trial referee found both Gagliardi and Incendy competent for purposes of voicing an opinion regarding the reasonable values of the machines at the time of their sales. We agree because experts and owners of property are competent to testify as to the value of the property. See *Griffin* v. *Nationwide Moving & Storage Co.*, 187 Conn. 405, 422, 446 A.2d 799 (1982).

tions omitted.] . . . . It is axiomatic that the determination of the credibility of expert witnesses and the weight to be accorded their testimony is within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." *Hartford Federal Savings & Loan Assn.* v. *Tucker,* 196 Conn. 172, 183, 491 A.2d 1084, cert. denied, 474 U.S. 920, 106 S. Ct. 250, 88 L. Ed. 2d 258 (1985); see also *Turgeon* v. *Turgeon,* 190 Conn. 269, 274–75, 460 A.2d 1260 (1983); *Griffin* v. *Nationwide Moving & Storage co.,* 187 Conn. 405, 422–23, 446 A.2d 799 (1982).

Here, the trial referee was presented with two divergent opinions that were approximately $70,000 apart and only marginally supported. Gagliardi admitted during his testimony that he was only "reasonably" familiar with molding machines as they existed in 1974 and that he was unaware of their actual 1974 costs. He further testified that the manufacturer of the machines, with whom he spoke prior to trial, had difficulty in establishing the 1974 values because of the difficulty in going back ten years into its files. In addition, his opinion stated that the $105,000 received by Gavlick was the fair liquidation value as of January, 1975, given the market conditions existing in the plastics industry. We first note that two of the machines were sold sometime before April, 1975, and the remaining two sometime before February, 1976. No one testified as to the market conditions after January, 1975, and, in fact, Gagliardi's testimony could lead one reasonably to infer that the conditions in the plastics industry later became more favorable to disposing of the machines at a better price. He had testified that the adverse effects of the oil embargo of 1973 on the plastics industry lessened within three years and that, possibly, the prices for such machines stabilized even earlier. Thus, the conditions of the plastics industry were unclear when the four machines were actually sold. Accordingly, we

cannot find that the trial referee erred in concluding that CBT had failed to present sufficient evidence to overcome the presumption that the value of the collateral was equal to the amount of the debt. This conclusion is further supported in light of the conflicting evidence of value presented by Incendy.

Therefore, we hold that CBT failed to demonstrate what the reasonable value of the machines was at the time of the sales or that the sales of the machines were conducted in a commercially reasonable manner. Thus the trial court properly denied the deficiency judgment sought by CBT.

There is no error.

In this opinion the other justices concurred.