**In the Matter of Joseph A. MARINO, Jr., Elizabeth A. Marino, Debtors.**

**Bankruptcy No. 2–87–00267.**

United States Bankruptcy Court, D. Connecticut.

Aug. 8, 1988.

Mark E. Block, Linda J. Kidder and Jeffrey T. Walsh, O'Brien, Shafner, Bartinik, Stuart & Kelly, P.C., Norwich, Conn., for debtors.

Peter J. Sterling, Glastonbury, Conn., for claimant, GLB Associates.

## MEMORANDUM OF DECISION ON DEBTORS' OBJECTION TO ALLOWANCE OF CLAIM

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

Joseph A. Marino, Jr. (Joseph) and Elizabeth A. Marino (Elizabeth) are debtors in a chapter 13 case in which there is a confirmed plan. The present proceeding arises from the debtors' objection to the allowance of a claim in the amount of $86,929.47 filed by GLB Associates (GLB). The claim, filed on December 21, 1987, states that the consideration for the debt was a "[l]ease of personal property and restaurant equipment." GLB attached the lease to its proof of claim. Hearings held on May 12 and May 18, 1988 established the following factual background. The court has also taken judicial notice of bankruptcy schedules and pleadings contained in court files.

### II.

The debtors were the sole stockholders and officers of Amos–Crosby, Inc. (Amos), the operator of a restaurant and lounge located at leased premises in New London, Connecticut. During 1985 Amos was experiencing cash shortage problems, and Charles R. Daley (Daley), a public accountant for both Amos and the debtors, arranged for Amos to secure $95,000.00 from GLB, a partnership in which Daley was the managing partner. Daley, who had prior experience in putting together financing arrangements, structured the following transaction.

GLB purchased the restaurant equipment from Amos for $95,000.00, the equipment's book value. GLB immediately leased the equipment back to Amos for a

term of five years with monthly rental payments of $2,589.68. The lease contained an option for Amos to repurchase the equipment at the end of the lease term for $1,900.00. The lease further provided in pertinent part that Joseph maintain, during the term of the lease, a life insurance policy on his life for $95,000.00 payable to GLB, and that Amos: (1) pay 14% interest on late monthly payments; (2) assume responsibility for any loss or damage to the equipment; (3) maintain insurance on and pay all taxes levied upon the equipment; (4) execute a security agreement and financing statement as a debtor in favor of GLB to secure the "performance of the terms and conditions of [the] lease"; and (5) retain Daley as its accountant.

In the event of a default, the lease provided that GLB could take possession of the equipment and either relet the equipment to others, with Amos being responsible for any deficiency in rental payments, or GLB could sell the equipment and apply the net sale proceeds "against the termination value of the equipment sold as specified in the schedule or schedules attached", provided that if the proceeds were "less than the termination value so determined" Amos would immediately pay GLB the difference. No such schedules of specified termination value were attached to the lease.

Daley executed the lease on behalf of GLB, and Joseph signed the lease twice— once as the duly-authorized president of Amos, and again over a line under which the word "Individually" appeared. Elizabeth also executed the lease on a line under which the word "Individually" appeared. Joseph and Elizabeth were not identified in the lease except as described above.

In like manner and at the same time, the parties executed a document entitled "Security Agreement" which, *inter alia*, stated that "WHEREAS, [GLB] has agreed to lease equipment described on Exhibit C to [Amos] pursuant to the terms of a lease attached hereto as Exhibit B, subject to certain terms and conditions including but not limited to the condition that [Amos] grant to [GLB] a Security Interest in the

property described herein", Amos granted GLB a security interest in the equipment. The third and final document executed was a financing statement signed by Joseph as the debtor and Daley as the secured party. All papers were prepared by GLB's attorney and dated and signed on December 28, 1985. Amos and the debtors were unrepresented by counsel during the entire transaction, and only Daley and the debtors were present when the papers were executed.

Amos, on December 23, 1986, filed a chapter 11 bankruptcy petition. On April 21, 1987, at the request of Amos, the court converted the case to one under chapter 7 and appointed a trustee. GLB, on May 6, 1987, filed a motion requesting relief from stay, alleging that it held a security interest in equipment "owned by" Amos "with an approximate value of $75,000.00", and that "the debtor has no further need for the property to run his [sic] business." The trustee did not object to the relief requested, and the court granted the motion by order dated June 26, 1987.

GLB thereafter contacted Robert Maher, a restaurant consultant and designer, to have him sell the equipment. Maher testified that in his opinion the equipment would sell for $25,000.00 if the "right person" were located. He called five persons who he believed might be interested in the purchase of used restaurant equipment. Three of these people came to inspect the equipment at the New London premises, with one making an offer in the amount of $10,000.00. There was no advertising that the equipment was for sale, and Maher did not consider holding a public auction, never having previously conducted one. GLB accepted the $10,000.00 offer, and retained $6,000.00 in net proceeds. Neither GLB nor Maher gave prior notice to Amos or to the debtors of the disposition of the equipment.

Daley claimed at trial that the debtors' liability arose, in effect, from their status as guarantors of the lease obligations. He sought to establish the extent of the obligation as follows. GLB had borrowed from a bank the sum of $95,000.00 payable

over a five-year term with interest at 12% per annum to provide the funds for purchase of the Amos equipment. As Amos thereafter made monthly rental payments to GLB, GLB made a corresponding payment to the bank. Amos made a total of six monthly rental payments to GLB. Daley testified that the principal balance due the bank after six payments, based upon the bank's amortization schedule, was $83,916.69. To that amount, Daley added the sum of $7,012.78 for interest computed at 14% per annum from the date of Amos' last payment to the date of filing of the proof of claim, and the sum of $2,000.00 for legal fees. From that total, Daley subtracted the net proceeds of $6,000.00 received from the sale of the equipment to establish the deficiency of $86,929.47.

Notwithstanding the failure of the lease to describe either debtor as a lessee or a guarantor, Daley contends that he told the debtors they were signing the lease personally to guarantee the lease obligations.

Each debtor testified no such statements were made. Joseph testified that Daley told him that Joseph's signature as an individual was necessary because Joseph was a stockholder and that Daley never stated that Joseph was signing as a lease-guarantor. Elizabeth testified that Daley stated to her that her signature was required only because she was a stockholder. Elizabeth stated that Daley advised her that if the lease payments were not made, GLB could take possession of the equipment, but he never mentioned any possibility of personal liability on the part of the debtors.

### III.

■ "A proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute prima facie evidence of the validity and amount of the claim." Bankr. R. 3001(f). A filing "in accordance with" the rules, in order to receive the benefit of the claim's prima facie validity, means that the proof of claim must "set forth the facts necessary to support the claim." 8 L. King, *Collier on Bankruptcy* ¶ 3001.05 (15th ed. 1988). As discussed in section III.A, *infra*, GLB's proof of claim did not

set forth the necessary facts, it was not entitled to the presumption of prima facie validity, and the burdens of going forward and of proving its claim by a preponderance of the evidence are on GLB.

Three principal objections made by the debtors to GLB's proof of claim are dispositive of the issue before the court. Other objections briefed need not be considered in view of the court's rulings.

### A.

■ The debtors claim that there is no proof of the amount of any debt due from the debtors. As noted, the lease provided that upon default, damages for the default would be set by a "termination value" determined according to schedules attached to the lease. GLB has not shown that any such schedules exist. Accordingly, no damages for default can be calculated. Daley's use of the bank amortization schedule does not provide evidence of the "termination value" set by the lease. The papers signed by Amos and the debtors provide no basis for their liability except for the default provisions under the lease. The lease specifically states that the security agreement was intended only to create a security interest in the equipment to secure the performance of the terms of the lease. GLB's post-trial brief concedes that Daley's method of computing its debt "may not meet the exact requirements of the documents." *GLB's Reply Brief* 8. I conclude that GLB has not established a valid basis for the amount it claims is due from the debtors.

### B.

■ GLB correctly acknowledges that the sale and leaseback arrangement between it and Amos was a financing arrangement, with the lease intended as a form of security. The transaction, therefore, is governed by Article 9 of the Uniform Commercial Code, Conn.Gen.Stat. § 42a–9–101 *et seq.* (1987). *See In re Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr.D.Conn.1980). GLB does not dispute that it was obligated to give notice to the debtors of its intention to dispose of the equipment, and that when it did not, a

rebuttable presumption arose that the value of the equipment was worth at least the amount of the debt. *See Connecticut Bank and Trust Co. v. Incendy*, 207 Conn. 15, 27, 540 A.2d 32 (1988). GLB, accordingly, had the burden to show "that each and every aspect of the sale was conducted in a 'commercially reasonable' manner" as required by the Commercial Code. *Incendy*, 207 Conn. at 28, 540 A.2d 32; *see* Conn. Gen.Stat. § 42a–9–504(3) (1987). I conclude that GLB has not carried its burden of proof. "[T]he burden rests upon the secured party to establish the fair market value of the collateral at the time of the sale by presenting credible and objective evidence of the value other than the price received or the opinions of its own agents and employees." *Incendy*, 207 Conn. at 31, 540 A.2d 32. GLB presented no such evidence, and this failure by itself bars any recovery by GLB of a deficiency. In any event, a private sale, made without advertising, with no prior attempt to conduct a public auction, with only five calls to potential buyers, the acceptance of an offer of $10,000.00 when GLB had earlier claimed the property was worth $75,000.00, would not constitute a commercially reasonable disposition of the equipment. *Cf. Incendy*, 207 Conn. at 28, 540 A.2d 32.

### C.

I further conclude that GLB has not met its burden of proving the debtors signed the lease for the purpose of becoming personally liable for the lease obligations. Although Daley testified that he told the debtors that their signatures were necessary to make them personally liable, no such language appears anywhere in the lease. The debtors both testified that they signed the documents because Daley advised them that their signatures were necessary only because they constituted the Amos stockholders. Without further substantiation, GLB has not furnished the preponderance of the evidence necessary to establish its contention that the debtors are personally liable for any obligations Amos incurred under the lease.

An order may enter sustaining the debtors' objection to the allowance of the claim of GLB.