**In re Wayne J. KLEIN, Debtor.**

**Bankruptcy No. 86 B 19937.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Feb. 22, 1990.

See also, D.C., 100 B.R. 1004.

Lawrence R. Moelmann, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for movant.

Bruce C. Scalabrino, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for respondent.

## MEMORANDUM OPINION ON TRUSTEE ELECTION

ERWIN I. KATZ, Bankruptcy Judge.

On December 19, 1986, an involuntary Chapter 7 case was commenced against Wayne J. Klein ("Debtor") by United States Fidelity and Guarantee Company ("USF & G"), Harris Trust and Savings Bank, ("Harris") and Continental Bank ("FDIC"). This case was originally assigned to Bankruptcy Judge DeWitt. On December 30, 1986, an order was entered appointing an interim trustee in this case. On January 2, 1987, Ilene F. Goldstein ("Goldstein" or "Trustee") accepted the appointment as interim trustee and subsequently became the permanent trustee in the Chapter 7 case. At the first meeting of creditors in the Chapter 7 case, creditor United States Fidelity & Guaranty Company did not request an election of a trustee. On Motion of Debtor on May 29, 1987, the Chapter 7 case was converted to a case under Chapter 11 of the Code.

On May 21, 1987, USF & G filed a motion with this Court to Appoint Chapter 11 Trustee; To Convert The Chapter 11 Case To A Chapter 7 Case, To Schedule A Hearing For Conversion; And To Prescribe Notice For Same. Goldstein was appointed the Chapter 11 Trustee. On July 7, 1988, this case was reassigned to Bankruptcy Judge Erwin I. Katz. On June 22, 1989, the Chapter 11 case was converted to a case under Chapter 7 of the Code and Goldstein was appointed interim trustee. On July 25, 1989, USF & G filed its proof of claim based on payments made by USF & G on its surety bonds for various Klein entities, all of which were guaranteed by Debtor.

On July 26, 1989, a first meeting of creditors was held in the Chapter 7 case. At the meeting, USF & G requested a trustee election. Goldstein objected to USF & G's right to vote because it did not hold an undisputed, fixed, liquidated claim (Bankruptcy Code § 702(a)(1)) and because USF & G held an interest materially adverse to other creditors of the estate (Bankruptcy Code § 702(a)(2)). William Brandt, former counsel for Wayne J. Klein; Ernest Summers III, counsel for Chadwell & Kayser, Ltd., former counsel for Trustee; and John Messina, counsel for Frederick Quinn, all creditors of the estate, joined in Goldstein's objections. The Harris Bank, although not formally lodging a separate objection to USF & G's claim, indicated its support of Goldstein's position on this issue, and effectively joined with the Trustee in her objection, which was made on behalf of all creditors. Goldstein had also objected to the right of certain other creditors to vote.

An election was held in which Stanley Obuchowski ("Obuchowski") was elected trustee. USF & G was the only creditor who voted for Obuchowski. All of the other voting creditors voted in favor of Goldstein. On July 28, 1989, the United States Trustee filed a Report of Disputed Election. On or about August 1, 1989, USF & G filed a Motion To Confirm Election Of Trustee, And for Additional Relief. On August 18, 1989, Goldstein, as Trustee, the Harris Bank, and Frederick Quinn, filed their objections, answers and affirmative defenses to USF & G's motion.

This Opinion shall constitute Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 and Bankruptcy Rule 7052.

### Standing

Upon Goldstein's objection to USF & G's motion to confirm election, USF & G challenged Goldstein's standing to raise the objection. USF & G relied particularly upon *In re G.I.C. Government Securities, Inc.,* 56 B.R. 105, 108 (Bankr.M.D.Fla.1985) which held that an interim trustee does not have standing to challenge a creditor's right to hold an election. On oral argument, USF & G also cited to language in *In re Sandhurst Securities, Inc.,* 96 B.R. 451, 457 (Bankr.S.D.N.Y.1989) which indicates

that there is some danger of an interim trustee merely advancing her own interests in becoming permanent trustee.

As Goldstein pointed out in response, however, the case law on this issue has not followed the *G.I.C.* case. First, in *In re Metro Shippers, Inc.*, 63 B.R. 593, 598 (Bankr.E.D.Pa.1986), the court specifically disagreed with the *G.I.C.* case and granted standing to the interim trustee to object to a trustee's election. The *Metro Shippers* court based its holding on due process grounds, looking upon the interim trustee as someone who stands to lose valuable rights through the election process. As the court put it, "Due process would seem to require that he (the interim trustee) has standing to challenge any defects in the process by which those rights were lost." *Id.* at 598.

Subsequent cases have grounded the interim trustee's standing more firmly on the interim trustee's role as the representative of creditors. The leading case so holding is *In re Poage*, 92 B.R. 659, 663 (Bankr.N.D. Tex.1988). The court in that case was dissatisfied with the *Metro Shippers* due process rationale. The court reasoned instead that the Advisory Committee Notes to Bankruptcy Rule 2003, the rule governing disputed elections, indicate that an election dispute is ripe for resolution by the court "when an interested party presents the dispute to the court." The *Poage* court noted that a trustee is a party in interest, for purposes of objecting to claims in connection with final disallowance and distribution, under Bankruptcy Code Section 502(a). The court reasoned that since the interim trustee is the representative of the estate, and the policy behind the Section 702 election provisions is to protect the estate, *In re Kam Kuo Seafood Corp.*, 42 B.R. 558, 560 (Bankr.S.D.N.Y.1984), it follows that the interim trustee has standing as the "optimal party" to raise objections under Section 702. *Poage* was cited with approval, and followed in *Matter of NNLC Corp.*, 96 B.R. 7 (Bankr.D.Conn.1989).

The discussion in the *Sandhurst Securities* case, cited by USF & G, in this Court's opinion, actually supports Goldstein. That court cited *Poage*. It further observed that interim trustees represent the estate, and are often in the best position to ascertain whether a creditor holds a materially adverse interest or is an insider, both of which are grounds for disqualifying a creditor from voting. 96 B.R. at 457. The court did discuss the danger of an interim trustee advancing her own interests, as pointed out by USF & G. However, the court discussed that point in the context of observing that the bankruptcy court is in the best position to exercise supervisory control over the election process and thereby ameliorate any danger posed by the interim trustee's self-interest.

The United States Trustee, at the behest of this Court, has also taken a position on the issue of the interim trustee's standing to object to a creditor's right to vote under § 702. The United States Trustee has suggested that the interim trustee has standing under § 704(5), since it is the duty of the trustee (which includes, under § 701(c), the interim trustee) to, "if a purpose would be served, examine proofs of claim and object to the allowance of any claim that is improper."

This Court certainly finds this argument persuasive. This Court further notes that the United States Trustee's argument leads to the same conclusion in this case as is reached by following the analysis of the relevant case law.

It is true that the legislative history makes clear that the overriding policy behind § 702 is to encourage actual creditor interest and control over the trustee election process and the bankruptcy case in general. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) pp. 102–03 U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, 6063, 6064. Nevertheless, there is no reason to conclude that granting the interim trustee standing to object will diminish creditor control, particularly in this case where Goldstein is supported in her objections by a number of creditors, notably Harris Bank and Quinn.

The interim trustee's standing is not in lieu of creditor participation but in addition thereto. The interim trustee's participation

in the election process will have the salutary effect of encouraging the participation of small creditors who would not otherwise participate because they would conclude that their stake is too small. Having the interim trustee carry the ball for them is precisely in keeping with her function as creditor representative.

This Court, therefore, holds that Goldstein's participation, as interim trustee, in this election dispute, is "optimal", as *Poage* put it, and she is granted standing to object to USF & G's qualification to vote.

The Trustee also makes various other objections to USF & G's claims, based on § 702(a)(1) and Bankruptcy Rule 2003(b), as follows:

(a) USF & G is alleged to have filed a proof of claim insufficient on its face because the proper attachments were not made and it was not properly signed. Prior to trial, the Trustee agreed that this issue could be resolved without the need for taking evidence;

(b) The election meeting should have been adjourned rather than concluded for the Court to temporarily allow USF & G's claim; and

(c) Finally, the Trustee asserts that to the extent Rule 2003(b) permits a temporary allowance, it is in irreconcilable conflict with the Code itself and therefore must be invalid.

### Sufficiency of USF & G's Proof of Claim

■ Goldstein cites *In Re Marino*, 90 B.R. 25 (Bankr.D.Conn.1988) and *In Re All American Auxiliary Assn.*, 95 B.R. 540 (Bankr.S.D.Ohio 1989) for the proposition that the bonds must be attached to the proof of claim. At trial, Mr. Thomas Groseclose of USF & G ("Groseclose") testified that the bonds were issued to, and are held by the project owners, not USF & G. They represent obligations of USF & G to the project owners, rather than obligations of Klein or his companies to USF & G.

*In Re Marino*, 90 B.R. 25 (Bankr.D. Conn.1988) was a case in which the creditor relied on schedules to a lease to make out a claim. The lease, which was filed, did not contain the schedules which were necessary to determine the damages, and the court observed that no schedules had ever been attached to the lease. *In Re All American Auxiliary Assn.*, 95 B.R. 540 (Bankr.S.D.Ohio 1989) concerned an insider's claim for expenses. The denial of the claim was based not on the paucity of documentation, but on the claimant's failure to show that the expenses were reasonable, necessary and in pursuit of the debtor's business. These cases do not suggest that the bonds were required to be attached to the claim, nor do they call into question the adequacy of Groseclose's statement that USF & G made its payments in good faith and as a result of the issuance of the various bonds.

■ Goldstein also asserts that USF & G was required to attach either the vouchers or an itemized statement signed by an officer of USF & G to the Proof of Claim. Rule 3001 merely requires a Proof of Claim to contain "a written statement setting forth a creditor's claim." USF & G's claim conformed substantially to the official form. The document on which the claim is based is the Master Surety Agreement, which is attached as required by Rule 3002(c). This is sufficient under the rules to establish the *prima facie* validity of USF & G's claim. Bankruptcy Rule 3002(b) allows a creditor's authorized agent to execute a Proof of Claim. USF & G's Proof of Claim was executed by its attorney, Lawrence Moelmann ("Moelmann"), whose authority for that purpose is unquestioned.

■ The challenge to the validity of the Proof of Claim's signatures is based not on the Bankruptcy Rules but on the provisions of the Master Surety Agreement. As far as the Master Surety Agreement, its provisions are not controlling under Rule 2003(b). Even taking it at face value, however, it provides:

[T]he *voucher(s) or other evidence of such payment(s)* or an itemized statement of payment(s) sworn to by an officer of SURETY shall be *prima facie*

evidence of the fact and extent of the liability of UNDERSIGNED [Klein] to SURETY. (emphasis supplied)

Thus, while the itemized statement, executed by Groseclose, a nonofficer, constitutes prima facie evidence in a trial under the provisions of the Master Surety Agreement, such statement cannot limit or define the Proof of Claim requirements. The sufficiency of a Proof of Claim is tested by the provisions of the Code and Rules.

■ USF & G's Proof of Claim included a proper summary of the vouchers and payments, and stated that vouchers were not being attached because they were voluminous. It also tendered copies of the vouchers. The vouchers were present in court for the hearing. Accordingly, USF & G's Proof of Claim was sufficient on its face for purposes of Rule 2003(b)(3).

### Rule 2003 Adjournment

■ The claim that Rule 2003 requires an adjournment is based upon the Advisory Committee Notes to the Rule. Assuming those notes to be controlling authority, the relevant statement provides: "If it is necessary for the court to make a determination with respect to a claim, the meeting may be adjourned until the objection or dispute is resolved." Note that the language is unmistakably permissive: *"may be adjourned"*. There is no requirement that the meeting be adjourned.

■ In this case, no purpose would be served by an adjournment. No one has expressed any interest in changing his or her vote. By all indications, a continuation of the July 26, 1989 meeting would prove to be nothing more than a replay thereof. The Code and Rules should not lightly be read to impose requirements that smack of hypertechnicality and slavish formalism. This Court holds that its temporary allowance discretion is unaffected by whether the election meeting was concluded or adjourned.

### Temporary Allowance Under Rule 2003(b)(3)

■ Finally, the Trustee urges that any temporary allowance discretion provided for in Rule 2003(b)(3) is irreconcilably at odds with the statutory language of § 702(a)(1) which requires a fixed, liquidated amount, and must therefore fall in the face of that statutory language. Of course, in any case of conflict between the Rules and the Code, the Code controls. See 28 U.S.C. § 2075 (the rules may not abridge, enlarge or modify any substantive right); *In re Metro Shippers, Inc.* 63 B.R. 593 (Bankr.E.D.Pa.1986) (Trustee election is substantive right, overriding procedural requirements of Rule 2003).

■ Regarding the issue of temporary allowance, however, this Court perceives no conflict between § 702 and Rule 2003. As pointed out elsewhere in this Opinion, § 702(a)(1) is susceptible to the interpretation that multiple qualifying claims may be aggregated or that a single claim may be bifurcated into its qualifying and nonqualifying parts with the vote being based on the qualifying part. *See, e.g., In re Blesi,* 43 B.R. 45 (Bankr.D.Minn.1984) (creditor allowed to vote portion of its claim that was not disputed). Interpreted in this way, § 702 is consistent with Rule 2003.

### Trustee's Affirmative Defenses

Before trial this Court disposed of a number of other preliminary matters. The first was the standing question, dealt with in detail in this Opinion. Other matters included cross-motions for summary judgment brought by USF & G on the grounds that it held a fixed and liquidated claim as a matter of law and by the Trustee on the grounds that USF & G held a materially adverse interest as a matter of law. This Court denied both motions, finding material and genuine issues of fact on both questions which could only be resolved at trial.

■ The Trustee asserted a number of other grounds, styled "affirmative defenses", in opposition to USF & G's motion to confirm Obuchowski's election. The Trustee claimed an estoppel because USF & G failed to oppose her election at the first meeting of creditors held when the case was originally filed under Chapter 7. This Court found no grounds for an estop-

pel, both in view of the fact that no reliance was claimed on USF & G's former actions, and on the fact that any such reliance could not have been reasonable as a matter of law given the vast change in circumstances between the original first meeting and the one held on July 26, 1989. Furthermore, qualified creditor suffrage under § 702 is a substantive right, *see In re Metro Shippers, Inc.,* 63 B.R. 593 (Bankr.E.D.Pa. 1986), and there is no authority for abridging that right on the grounds of estoppel.

■■■ The Trustee also sought to introduce the issues of her qualifications and background in the case as well as Obuchowski's lack of background and purported lack of qualification as a trustee. The Trustee, in particular, cited to the fact that Obuchowski is not an attorney. The Trustee, however, made no claim that Obuchowski is ineligible to serve as a trustee under Code § 321. As such, this Court ruled that the question of the relative qualifications of Goldstein and Obuchowski are irrelevant to the instant election dispute. An election under § 702 presupposes multiple candidates for trustee, some of whom may be more qualified than others. Nothing in § 702 requires that the most qualified candidate win, so long as the candidate who does win is eligible under § 321. Reading such a "best qualified" requirement into § 702 would effectively defeat its purpose. It would substitute the court's judgment, by assessing qualification, for the creditors' collective judgment by voting.

The evidentiary hearing commenced on December 4, 1989, and concluded on December 14, 1989. The issues were finally briefed and concluded, and the matter taken under advisement, on January 31, 1990.

At the trial, USF & G assumed the burden of going forward on the fixed and liquidated issue, presenting the testimony of Mr. Thomas Groseclose. The Trustee and other opposing parties offered rebuttal testimony on that issue by Allan J. DeMars, trustee of the Klein Construction Company estate, and Goldstein. Goldstein was the first to present evidence on the material adversity issue. Other witnesses testifying on that issue were Donald F.

Engel, attorney for Patrick Stanton, Lawrence Fisher, former attorney for Wayne J. Klein, and Lawrence Moelmann, attorney for USF & G.

We now turn to the substantive bases for the Trustee's objection to USF & G's qualification to vote.

*Fixed and Liquidated Requirement Under § 702 and Rule 2003*

Section 702(a)(1), 11 USC 702(a)(1), requires that a creditor hold "an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution ..." The objecting parties assert that USF & G's claim is not liquidated and not fixed.

■■■ A claim is "fixed" under § 702(a)(1) so long as it is not a "contingent" claim. See Bankruptcy Act §§ 63a.(1) and 67d.(1)(b) (the later section is the antecedent of Code § 101(4)(A)). Accordingly, the issues raised in these proceedings are whether USF & G's claim is liquidated, and whether USF & G's claim is contingent.

■■■ In order for a claim to be liquidated, it is not necessary that it first be reduced to judgment. Rather, whether or not a claim is liquidated depends upon the nature of the obligation. The possibility of future offsetting recoveries or additional losses does not necessarily change the nature of the underlying obligation.

*In Re Poage,* 92 B.R. 659 (Bankr.N.D. Tex.1988) addressed this question. In *Poage,* the creditor, Merrill Lynch, held a promissory note signed by the debtor, Allison Poage, on which James Poage was jointly and severally liable. In its proof of claim, Merrill Lynch reserved its right to seek recovery from James Poage. Accordingly, the interim trustee in *Poage* argued that the possibility of recoveries from third parties rendered the claim not liquidated with respect to a § 702 election. The court held:

A debt is liquidated if the amount due and the date on which it was due is fixed and certain, or when they are ascertainable by reference to (1) an agreement or (2) a simple mathematical formula. (citation omitted) Generally, a debt based on

a promissory note is liquidated because the amount due can be determined from the promissory note and supporting documentation. The fact that Merrill Lynch may have recourse against James Poage or other individuals does not make Poage's debt unliquidated since the promissory note provides that Poage is jointly and severally liable for full payment.

*Id.* at 665.

■ In determining whether USF & G's claim is liquidated, it is certainly highly relevant to examine the terms of the Master Surety Agreement. In § III thereof, Klein agreed to indemnify USF & G from all liablities, losses, expenses, and attorneys' fees sustained by USF & G as a result of its execution of bonds on behalf of Klein Construction Company and the other principals. The Master Surety Agreement specifically provided that Klein would be jointly and severally liable just as did the promissory note in *Poage*.

■ However, the *Poage* case dealt with a claim under a promissory note. Other types of claims, such as that of a guarantor or surety, although liquidated, may nevertheless be defective under § 702 because they are contingent. *See. e.g., In re Albano*, 55 B.R. 363 (Bankr.N.D.Ill. 1985). This defect arises precisely because of the availability of offsets and recoveries reducing the amount due from the principal obligor. But, of course, if all contingencies have already been resolved in favor of liability and there is no longer any possibility of offset or recovery, even the claim of a guarantor or surety ceases to suffer from the defect of contingency.

The evidence has shown that USF & G's claims against the Klein estate arise from 29 separate transactions. If under § 702(a)(1) and Bankruptcy Rule 2003(b) the entire claim must be evaluated as a whole, the fact that one or more of these 29 transactions does not involve potential offsets and recoveries would not be sufficient to override the fact that one or more of them does. The entire claim would have to stand or fall as a unit notwithstanding the fact that it is based upon discreet and severable transactions. If, however, each transaction can be viewed separately, all that would be necessary would be to total up those transactions not subject to potential offset or recovery and determine if the total thus generated meets the thresholds of § 702, i.e., 20% to call the election and 50% to win.

Groseclose of USF & G identified all potential recoveries that USF & G might realize from third parties. The maximum amount of potential recoveries by USF & G, as identified by Groseclose, is approximately $10 million. Tr. p. 30–48. No other evidence of potential recoveries was offered. Consequently, there is no evidence that USF & G's final claim would fall below $20 million.

More particularly, this court examined Mr. Groseclose concerning each of the 29 projects. Tr. p. 103 et seq. The testimony thereby elicited from Groseclose, which is substantially uncontroverted, can be summarized as follows:

| | Project | Amount of Claim on 7/26/89 | Potential Increase (Reduction) | Total |
|---|---|---|---|---|
| 1. | USA DOE | 146.73 | – | 146.73 |
| 2. | Dallas Sch. | 1,166,778.02 | – | 1,166,778.02 |
| 3. | Cook Cty. Hsg. Auth. | 1,853.20 | – | 1,853.20 |
| 4. | Chgo. 14th Dist. Police | 76,889.81 | (96,113.65) | (19,223.84) |
| 5. | U.S. Army Fitzsimmons | 23,045.00 | (8,000.00) | 15,045.00 |
| 6. | Sch. Bd. of Broward Cty. | 30,000.00 | – | 30,000.00 |
| 7. | Pace Melrose | 645,793.13 | Unspecified | Unspecified |
| 8. | Jeff. Cty Sch. Dist.—Chaffield | 490,567.27 | – | 490,567.27 |
| 9. | U.S. Postal Serv. F.W. | 1,254,584.44 | (58,803.78) | 1,195,780.66 |

| Project | Amount of Claim on 7/26/89 | Potential Increase (Reduction) | Total |
|---|---|---|---|
| 10. Chgo/OHare | 624,009.74 | Unspecified | Unspecified |
| 11. CTA 103 St. | 7,756,306.47 | – | 7,756,306.47 |
| 12. Bd. of Dir. Nichols | 2,021.00 | (1,200.00) | 821.00 |
| 13. U of I | 4,805,622.37 | Unspecified | Unspecified |
| 14. Woodbridge Police | 2,463.97 | – | 2,463.97 |
| 15. Stevenson H.S. | 4,173,366.61 | 55,039.01 | 4,228,405.62 |
| 16. Metra/Burl. | 2,439,247.32 | 583.30 | 2,439,830.62 |
| 17. Naperville Nichols I | 29,285.68 | – | 29,285.68 |
| 18. Bd. of Ed. | 0.00 | – | 0.00 |
| 19. Hispanic | 901,616.43 | (1,160.60) | 900,455.83 |
| 20. Pace | 1,658,998.29 | (162,501.50) | 1,496,496.79 |
| 21. U.S. Postal Serv. | 225.00 | – | 225.00 |
| 22. Warren Pk. | 553,338.74 | Unspecified | Unspecified |
| 23. Naperville Sprgbrook | 212,804.91 | (42,000.00) | 170,804.91 |
| 24. St. Vrian Valley Sch. Dist. | 23,686.00 | – | 23,686.00 |
| 25. Metro San. Dist. | 3,217,976.07 | (682,859.58) | 2,535,116.49 |
| 26. Naperville Well # 21 | 0.00 | – | 0.00 |
| 27. Boca Raton | 494,673.42 | – | 494,673.42 |
| 28. Capital Div. Bd. —Sunnybrook | 808.20 | Unspecified | Unspecified |
| 29. Gr. Boca Raton Tx. Dist. | 235.00 | – | 235.00 |

The total amount of claims of USF & G against the Klein estate, with respect to which there has been *no* change and *no* potential for change since July 26, 1989, the date of the election, namely, claim items 1, 2, 3, 6, 8, 11, 14, 17, 18, 21, 24, 26, 27 and 29, is in excess of $9,996,220.[1] Even one contract and bond, namely the CTA 103rd St. contract, would be sufficient to meet the threshold requirements of § 702. The CTA 103rd St. contract was deemed rejected by order dated October 15, 1986. The CTA thereafter served demand upon USF & G to perform its obligations under the performance bond. As of the date of the election, USF & G had paid out $7,756,306.47 on the CTA 103rd St. project. Tr. pg. 108–9. There is no potential for further recovery on that project. Tr. pg. 109. USF & G's claim in connection with just the CTA 103rd St. project, which claim is not subject to any further change, meets the mathematical requirements of § 702.

It thus becomes crucial to examine the provisions of Code § 702(a)(1) and Bankruptcy Rule 2003(b) to determine whether USF & G's claim of close to $10,000,000, which was unquestionably liquidated, absolute, fixed and noncontingent as of July 26, 1989,[2] the date of the election, and which is far more than the 20% of claims necessary to call an election and the majority of claims voting necessary to win the election, is somehow tainted by other claims of USF & G which do not meet the § 702(a)(1) criteria. § 702(a) itself sheds little light since it speaks only of a creditor holding a claim, saying nothing about whether the creditor may hold other claims or whether the claim counted under § 702(a)(1) may be composed of various smaller subclaims.

1. The Trustee and the other objecting parties have conceded that this amount would be sufficient to allow USF & G to control the election.

2. The Court allowed evidence to be introduced of developments after the election date, July 26, 1989. That evidence is only admissable and material insofar as it sheds light on the status of the claim as of July 26, 1989.

Bankruptcy Rule 2003(b)(3), on the other hand, does deal with a situation where there is some doubt as to the amount of a claim to be taken into account for purposes of § 702. It states, in the last sentence thereof: "Notwithstanding objection to the amount or allowability of a claim for the purpose of voting, the court may, after such notice and hearing as it may direct, temporarily allow it for that purpose in an amount that seems proper to the court."

■ The Trustee wishes to read into that language a requirement of a prior request for estimation, similar to the procedure found in § 502(c) of the Code, before the court may exercise the temporary allowance discretion. This Court notes that Rule 2003 does not use the term "estimation". In addition, the only conditions precedent to temporary allowance are (1) an objection and (2) notice and hearing, both of which have been met in this case.

The process of estimation under § 502(c) deals with clearly contingent, unliquidated claims which must be assigned a dollar figure or be forever barred from allowance. The Code does away with the concept of provability under the Act and provides, in § 101(4)(A), that the term "claim" includes contingent, unliquidated claims. Therefore, the latter alternative of barring the claim is unacceptable.

■ Under § 702, on the other hand, the mathematical precision which lends itself to the declaration of a clear winner of an election is a more important value than the full participation of all creditors. Claimants whose claims are nebulous or incapable of any definition are barred from voter participation. It is true that a contingent, unliquidated claimant is also represented by the trustee and should have a voice in her election. That cannot be done, however, without making the process wholly arbitrary; thus, full creditor enfranchisement is sacrificed for precision and predictability. It was in this light that this Court stated from the bench that it will not transform an unliquidated, contingent claim for purposes of election.

■ USF & G's claim, however, is cut from a different cloth. Even while placing upon USF & G the burden of every doubt and negative inference as to the amount of its claim, USF & G is still left with close to $10,000,000 worth of claims. Rule 2003(b) speaks in terms of an objection to the "amount or allowability" of a claim. Certainly, the provision could be applicable to various disputes regarding the allowability of a claim under § 702(a)(1). But for it to be applicable to an objection to the *amount* of a claim necessarily, in this Court's view, implies that the court may determine that some amounts meet the § 702(a)(1) tests and some do not. That is precisely what the court is doing here in determining that, even under a worst-case scenario, USF & G has claims totalling close to $10,000,000 which definitely meet the § 702(a)(1) tests.

In summary, USF & G meets the requirements of § 702(a)(1) to an extent sufficient to equal and surpass the threshold of § 702(b) (20% to call election), (c)(1) (20% voting) and (2) (majority of actual vote cast for particular candidate). We now turn to the question of whether USF & G meets the requirements of § 702(a)(2) (no material adverse interest).

### "Materially Adverse" Interest

The Trustee also objects to USF & G's right to vote under § 702 (11 U.S.C. § 702) claiming that USF & G holds an interest materially adverse to the interest of creditors. This raises the issue of when is a creditor disqualified from voting for a trustee because that creditor holds a "materially adverse" interest under Bankruptcy Code § 702(a)(2).

Bankruptcy Code § 702 reads in relevant part as follows:

(a) A creditor may vote for a candidate for trustee only if such creditor— ...

(2) does not have an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution....

The Legislative History, in Senate Report No. 95–989, states the following:

"Only a creditor ... that does not have an interest materially adverse to the interest of general unsecured creditors ... may vote for a trustee.... The application of the standard requires a balancing of various factors, such as the nature of the adversity. A creditor with a very small equity position would not be excluded from voting solely because he holds a small equity in the debtor." S.Rep. No. 95–989, 95th Cong., 2d Sess. 92, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6053.

Thus, both the language of the Code as well as the Legislative History highlight the requirement of adversity to "creditors entitled to ... distribution" or, as the Legislative History puts it, "general unsecured creditors", rather than material adversity to any individual creditor.

The first case under the Code to address the question of what constitutes material adversity was *In Re Lang Cartage Corp.*, 20 B.R. 534 (Bankr.E.D.Wis.1982). That case involved a creditor which executed on a state court judgment against the debtor in the amount of $77,542.72 and had caused the debtor's physical assets to be seized and sold at a sheriff's sale, thereby generating approximately $40,000 in proceeds, which were applied in partial satisfaction of that creditor's judgment. In addition, that creditor allegedly had garnished a number of the debtor's accounts, thereby obtaining approximately $28,000 which amount was also applied against that creditor's judgment. The trustee brought an adversary proceeding seeking to recover those sums as voidable preferences pursuant to § 547 of the Bankruptcy Code.

In discussing whether that creditor was disqualified from voting under Bankruptcy Code § 702, the court noted that § 702 denies a creditor the right to vote for a trustee when that creditor has an interest "materially adverse to the interests of other creditors whose claims are entitled to participate in any distribution from the bankruptcy estate." 20 B.R. at 536. The court held that there had been a sufficient showing to indicate that the creditor was the recipient of a preference so that the creditor's interest was materially adverse

under § 702. The court distinguished *In Re Hale Desk Co.*, 89 F.2d 1 (2d Cir.1937) decided under the Bankruptcy Act. In *Hale Desk* the court had held that the Referee in Bankruptcy was not justified in denying the right to vote because of a mere suspicion that the claimant had obtained an unlawful preference. In *Lang Cartage* the court had more than mere suspicion. Under *Lang Cartage* a preference recipient is adverse to other creditors as a matter of law.

In accord is *In Re Metro Shippers, Inc.*, 63 B.R. 593, 599 (Bankr.E.D.Pa.1986). In that case, the losing interim trustee sought to invalidate the vote of one of the creditors on the basis that the trustee had filed a preference action on behalf of the estate against that creditor after the election. The court stated the rule as follows: "[A]n unsecured creditor who holds an avoidable preference has an interest adverse to that of creditors expecting to receive pro rata distributions of the estate." The court held, in accord with *Lang*, that it is necessary to make a certain threshold showing that the creditor in question received a preference. More noteworthy is the implication in the above-quoted language that the required material adversity must be to the concept of all creditors receiving a pro rata distribution from the estate. Again, this carries a strong implication that the prohibition of the Code does not deal with adversity to a particular creditor, but rather adversity to the interests of creditors as a whole in maximizing their pro rata distribution from the debtor's estate.

In *In re Blesi*, 43 B.R. 45 (Bankr.D.Minn. 1984) the creditor's vote was challenged as materially adverse. The creditor in that case was a virtually equal shareholder with the individual debtor in a corporation. That creditor and the individual debtor had been involved in bitter contests over the control of that corporation resulting in state court litigation in which a sale of stock was ordered.

In discussing the issue of whether that creditor held a materially adverse interest disqualifying him from voting under § 702, the court made the following observations:

"[A]lthough Mr. Evans' (the creditor) interest is definitely materially adverse to the interests of Mr. Blesi, the debtor, I find no evidence that Mr. Evans' interest is materially adverse to the interests of the other creditors. It would appear that it is in Mr. Evans' best interest to have the value of the stock of Blesi–Evans' Co. (the corporation) remain as high as possible. It would also appear in Mr. Evans' best interest to keep the Blesi–Evans Co. in operation if he wishes to take it over, or, if it is to be sold, to obtain the highest value possible in order to pay unsecured creditors including himself. In any event, I was offered no evidence which would lead me to believe that Mr. Evans' interest is materially adverse to other creditors." 43 B.R. at 47. The court concluded that the creditor's interest was not materially adverse for purposes of § 702. Thus, the *Blesi* court dealt with the materially adverse issue as a question of fact.

A recent case discussing material adversity is *In Re Cohoes Indus. Terminal Inc.*, 90 B.R. 67, 70 (S.D.N.Y.1988). The claim of material adversity in that case was raised by insiders holding unsecured claims against other creditors. The court held the insiders had standing to raise the objections although they could not vote. The court applied a balancing of competing factors test. The court then noted that the party challenging the creditor's vote relied solely on the fact that, if the challenged creditor gets more from the debtor's estate, the insider creditors bringing the challenge will get less. The court held such a conflict to be inherent to the creditors of any insolvent entity. The court cited for this proposition the *Hale Desk* case which, as already pointed out, held that the mere suspicion of receiving a preference was not sufficient to invalidate a creditor's vote. The court closed with the following observation: "Had Congress intended for Code § 702(a)(1) (sic.) to disenfranchise virtually all creditors, it would have so stated, particularly since it must have been aware that the largest creditor typically selects the Debtor's trustee." 90 B.R. at 70.

Some courts, rather than disqualifying a creditor's vote, merely reduce the percentage amount for voting purposes. Thus, in *Metro Shippers, supra,* the court, rather than invalidating the vote of the preference creditor, merely reduced the amount of that creditor's allowed claim for purposes of voting by the amount of the alleged post-petition preference. This can be seen as an application of the requirement that the interest be *materially* adverse.

The case most analogous to the challenge asserted against USF & G is *In re Poage*, 92 B.R. 659, 666 (Bankr.N.D.Tex.1988). In that case, one of the creditors of the debtor had a claim against a party against whom the debtor also had a claim, which claim was characterized as possibly the largest asset of the estate. The court noted that such a situation could give rise to material adversity were the right factual showing to be made. In *Poage*, however, no such showing had been made, so that the material adversity allegation had not risen above the level of mere suspicion. The *Poage* court also echoed the central theme that the touchstone of adversity is the pursuit by the creditor of separate recoveries which minimize the estate as a whole, thereby operating to the estate's detriment. "Although circumstances could exist whereby it would be to Merrill Lynch's (the creditor) advantage to attempt to enhance its recovering from ATC (the common debtor) to the detriment of its recoveries from this estate, no facts have been presented that such circumstances exist or that Merrill Lynch would have the ability to manipulate its positions." *Id.* at 666.

The cases thus make clear that material adversity is measured by the effect on the creditor body as a whole, particularly by whether the challenged creditor's interest is such that it would tend to minimize distributions to the other creditors from the estate. Since merely opposing the claim of a single other creditor would not have the effect of minimizing distributions from the estate as a whole, it can fairly be concluded that such an interest does not qualify as materially adverse. Further, claims between creditors do not reduce the size of the estate and, therefore, also do not reduce the amount available for

distribution to other creditors. Such claims are not materially adverse for purposes of § 702.

However, a demonstrated pattern of activity, which effectively does, or tends to, reduce recoveries by the estate, whereby a creditor pursues its own separate recoveries in competition with the estate, falls into the classic pattern of material adversity. This is the same pattern of adversity demonstrated by secured parties, priority claimants, and equity holders, all of whom invariably find the pursuit of their best interests to be at odds with the interests of the general unsecured creditors of the estate by removing assets from the pool. The Code therefore denies them the right to vote for the trustee, the representative of the general unsecured creditors, under § 702(a)(2). Of course, an isolated transaction of separate recovery may not meet the materiality threshold. However, a repeated pattern of activity, whereby a creditor pursues its own recoveries, to the detriment of the estate, may demonstrate what the position of the creditor is vis-a-vis the estate. Such a pattern would be evidence of material adversity. So long as the creditor has not disgorged to the estate all benefits accrued as a result of such pursuit of its separate interests outside of the estate, and has not abandoned its purpose, it will remain in adverse position. Under § 702(a)(2), the relevant point in time for measuring such adverse interest, or its abandonment, is the date of the election.

This Court is quick to note that no stigma is intended to be attached to a creditor's pursuit of its own best interests. This is the way the Code is set up; no one expects creditors to be choir boys or to exhibit altruistic behavior. The unsecured creditors represented by the trustee would love to be in a position to recover outside the estate so that they would not have to be satisfied with the paltry distribution generally available for unsecured creditors. Circumstances, however, force them into an uneasy truce with their fellow residents at the low end of the totem pole. Because of their junior status the Code provides for their representation by a trustee.

If a creditor, otherwise unsecured, can maneuver itself to a position of prominence and influence, within the framework of the Code, so that it need no longer be satisfied with the general unsecured creditors' crumbs, more power to such creditor! However, such creditor, by its very position of superiority, no longer needs the Code's representation by a trustee and therefore should not be entitled to vote for one.[3]

Against this background, this Court will now examine the evidence relating to USF & G's behavior vis-a-vis the creditor body as a whole to determine whether the USF & G interest is materially adverse.

The Trustee has asserted ten "badges" of disqualification and has testified regarding the ten categories of transactions or occurrences that took place prior to the July 26, 1989 first meeting that led her to believe that USF & G held an interest materially adverse to the creditors of the Klein estate. Tr. at pg. 315–316.

*Harris Preference Action*

The first such transaction or occurrence is what Goldstein called the Harris Preference Action. She testified that the trustee of the Klein Construction Company ("KCC") estate filed a preference claim against Harris Bank in that case to recover $700,000 paid to Harris Bank by Klein Construction Company. This payment by Klein Construction Company allegedly paid off a Harris loan to Wayne Klein, Tr. at pg.

3. In addition, while the question is not before this Court, it may be true that no creditor of the Klein estate is free of a materially adverse interest; Harris may be a secured creditor, it is in the interest of the Klein Construction Company estate to saddle the Klein estate with a $700,000 lien, Quinn may have received avoidable transfers, etc. It may be that the Trustee has no one to represent other than a hypothetical general unsecured creditor who does not exist. All this is interesting, but of no moment. § 702(d) provides unequivocally that, in the absence of an election, the interim trustee continues to serve. Whether there is no election because no one called for one or because no one is qualified to vote is irrelevant; a valid election must be held to wrest the office from the interim trustee. In default thereof, the interim trustee continues to serve.

317, which had been secured by personal assets of Wayne Klein, Tr. at pg. 317, which were now in the Klein estate. USF & G supported the Klein Construction Company cause of action against Harris Bank. Tr. at pg. 318–324. (USF & G is also a creditor of the KCC estate). At the same time, Goldstein was attempting to set aside the Harris lien claim in the Wayne Klein case. Tr. at pg. 325. Her position was that Harris Bank had no lien since the loan had been repaid. Tr. at pg. 325.

Should the Trustee of the KCC estate prevail, Harris Bank would have to repay the $700,000 to the Klein Construction Company estate. Goldstein's position that Harris must release its lien because it had already been paid the $700,000 would arguably be invalid. Thus, Harris Bank would have a valid lien on $700,000 worth of property in the Wayne Klein case, which is $700,000 of property which could not be liquidated and its proceeds distributed to the unsecured creditors in that case. Tr. at pg. 326–329.

USF & G's support of the Klein Construction Company trustee on this issue demonstrates that USF & G's interest in recovering through the Klein Construction Company estate outside of the Klein estate overrides its interest in maximizing the Klein estate's recovery. It is thus arguably an adverse interest. The amount of $700,000 is a material amount. Since, however, USF & G is really forced into a Hobson's Choice situation, this evidence is only of slight value.

### Harris Lien Claim

 The second transaction or occurrence referred to by Goldstein is the Harris lien claim. Tr. at pg. 330. On October 1, 1986, Harris brought an action in the Circuit Court of Cook County against Wayne Klein. Tr. at pg. 330. Harris removed this action to the Bankruptcy Court as adversary proceeding 87 A 535. Tr. at pg. 331.

On September 10, 1987, USF & G was granted leave to intervene in this proceeding. On March 23, 1988, the court granted summary judgment in favor of Harris. Both the trustee and USF & G appealed

this decision and the District Court reversed and remanded the case to the Bankruptcy Court. On March 16, 1989, Harris filed a motion for rehearing and both the trustee and USF & G objected to the motion for rehearing. On May 12, 1989, and again on June 15, 1989, the District Court denied Harris' motion to reconsider its ruling. Tr. at pg. 330–332.

The actions of USF & G against Harris in this adversary proceeding may constitute an interest materially adverse to Harris but they do not constitute an interest materially adverse to the Klein estate creditors as a whole. Indeed, in view of the congruence of interest between the Trustee and USF & G on this issue it is absurd for the Trustee to claim USF & G's interest on this issue to be any more materially adverse than her own. The effect of USF & G's actions would be to maximize the Klein estate so this is not an instance of material adversity on USF & G's part.

### RICO/Adversary Settlements

 The third instance referred to by Goldstein is the RICO/adversary settlement. Goldstein, USF & G, the trustee for Klein Construction Company, Harris Bank, and Continental Bank attempted to negotiate a global settlement agreement whereby the adversary proceedings and the estate's purported RICO actions would be assigned to USF & G in exchange for certain returns from USF & G. Tr. at pg. 340–342. The initial agreement between the parties was that if there was a RICO recovery, the proceeds of such recovery would be paid to USF & G, and USF & G would work out a side agreement with other creditors for the sharing of these proceeds. Tr. at pg. 340–342. USF & G would receive 60% of the proceeds, and the bankruptcy estates would receive 20% each respectively. Tr. at pg. 341–342.

With respect to adversary recoveries, the Wayne Klein estate would receive the value of whatever recovery there was for each individual adversary, if the recovery was the return of property. Tr. at pg. 343. For example, if a property worth $500,-000.00 was recovered, and the property

was a Wayne Klein estate asset, the property would belong to the Wayne Klein estate. Tr. at pg. 343. USF & G would not share an interest in the recovery at all. Tr. at pg. 343.

If an adversary were settled and property claimed was not returned to the Klein estate, the dollar amount recovered would be allocated to the estate based upon the value of the property given up. Tr. at pg. 343. If a global settlement which resolved both the RICO cause of action and a Wayne Klein interest were reached, and the settlement was an unallocated cash settlement, USF & G's position became that that would be subject to the 60–20–20 formula. No allocation to the estate would be made for the property interest given up. Tr. at pg. 343–348. If the parties could not agree on an allocation, the court would decide. Tr. at pg. 344. The settlement broke down because USF & G demanded that, instead of the Klein estate recovering the value of the property, the proceeds be shared pursuant to the 60–20–20 formula, without regard to the value of the property given up. Tr. at pg. 344–348 and 1023–1025.

USF & G's position, as it developed, is evidence of some interest materially adverse to the creditors of the Wayne Klein estate. Tr. at pg. 347. Had Goldstein adopted USF & G's position, it would have cost the Klein estate the full value of property of the estate. USF & G would have received 60% of the recovery without fully compensating the Klein estate for the property interests given up. On the other hand, it could be argued that, in exchange, USF & G has agreed to share a portion of what it believed was its unique claim under RICO. Since this position involved recovery by USF & G, at the expense of the Klein estate, of settlement proceeds that could potentially have reached into the millions of dollars, these negotiations demonstrate some evidence of a materially adverse interest on USF & G's part. See Tr. at pg. 344–346 and 1094–1095.

*Eagle Ridge/Quinn Settlement*

The fourth transaction cited by Goldstein was the Eagle Ridge/Quinn settlement. This matter concerned the competing claims to the Eagle Ridge property. Mr. Quinn, the Klein estate, and Harris Bank all claimed an interest in Eagle Ridge. Tr. at pg. 348–349. In late Spring 1989, a meeting was held between the representatives of these parties and Moelmann on behalf of USF & G to attempt to resolve this dispute. Tr. at pg. 352–353. At this meeting, USF & G took the position that under no circumstances could Mr. Quinn be paid or receive any consideration for his interest in this property. Tr. at pg. 353–354.

The Trustee's position here again appears to be that an interest materially adverse to a single creditor amounts to a materially adverse interest under § 702. The material adversity is tested relative to the estate as a whole. Since this instance involves adversity to Quinn only rather than to the estate as a whole, it does not amount to a materially adverse interest on the part of USF & G.

*Klein Residence*

The fifth cited instance concerned the Klein residence. On June 1, 1988, USF & G obtained a judgment in the sum of $5,315,897.10 against Donna Jean Klein ("Ms. Klein") in a case captioned *United States Fidelity and Guarantee Company v. Klein Corporation, et al*, 86 CH 10115. The Trustee filed an adversary proceeding against Ms. Klein (87 A 0571) to recover, as a fraudulent conveyance, the property known as 637 Berkshire Court, Downers Grove, Illinois. Tr. at pg. 354.

USF & G attempted to intervene in the adversary proceeding on June 5, 1988. Tr. at pg. 355. On February 21, 1989, USF & G withdrew its motion to intervene. Tr. at pg. 355. USF & G has since taken the position that the transfers of this property should only be set aside to the extent that title is returned to Ms. Klein, rather than to the debtor, who transferred his interest in the property to Ms. Klein shortly before she transferred her interest to a third party. Tr. at pg. 354–356. USF & G has

maintained this position at all relevant times. Tr. at pg. 355–356.

USF & G's position on this issue is evidence of an interest materially adverse to the Klein estate. USF & G seeks to have the property returned to Ms. Klein, so that it can execute on its judgment and foreclose on the property, rather than having the property recovered by the Trustee for liquidation and eventual payment of its proceeds to Klein estate creditors. Tr. at pg. 355. It is a clear instance of a USF & G attempt to recover outside the estate to the detriment of the estate. The recovery sought, as well as the diminution of the estate, is in an appreciable amount. It reflects, therefore, a materially adverse interest.

### Stanton Settlement

■ The sixth transaction concerned the Patrick Stanton ("Stanton") settlement. On February 7, 1989, the Trustee filed an application to compromise and settle a controversy with Stanton. Tr. at pg. 356. On March 22, 1989, USF & G filed a response to the application. Tr. at pg. 356. The response did not raise an objection to the Trustee's pending application to compromise the controversy, but stated that if Stanton did not sign an independent agreement with USF & G, USF & G would object to the settlement.

At the hearing on the settlement motion of the Trustee, USF & G's separate settlement agreement with Stanton had not been executed and a recess was then taken wherein the agreement with USF & G was signed. USF & G then indicated to the Court that it had no objection to the approval of the settlement agreement. Tr. at pg. 356–359.

Had Stanton refused to execute USF & G's separate settlement agreement, USF & G would have objected for the purpose of inducing Stanton to pay USF & G for the release of its purported RICO claim.

Attorney Donald F. Engel testified that his client, Mr. Stanton, would have paid more to settle the adversary proceeding with the Klein estate if he did not have to pay USF & G $250,000 for its separate settlement. Tr. at pg. 759–760. In this instance as well, USF & G's actions cost the Klein estate an appreciable amount of money, which is money which would have eventually been distributed to unsecured creditors of the estate. Those actions, therefore, exhibit a materially adverse interest on the part of USF & G.

### Anderson Settlement

■ The seventh cited transaction concerned the settlement with Brian Anderson ("Anderson"). Tr. at pg. 359. Ms. Goldstein filed an application to compromise a controversy with Anderson. Tr. at pg. 359. USF & G filed an objection to the proposed settlement. Tr. at pg. 359. After a lengthy hearing, this Court did not approve the settlement because of the objection of USF & G. Tr. at pg. 359–360.

On July 14, 1989, a joint motion to reconsider the application to compromise the Anderson controversy was filed by the Trustee and Anderson. Tr. at pg. 360. This time, USF & G did not object. It prevailed upon Anderson to settle separately with USF & G, increasing Anderson's overall settlement cost and dissuading Anderson from paying more in settlement with the estate. This is the same type of effect USF & G's conduct had with respect to the Stanton settlement, an effect this Court has already found to constitute evidence of a materially adverse interest on USF & G's part. The analysis and conclusion regarding material adversity, therefore, are the same as with the Stanton settlement.

Furthermore, USF & G's separate settlement impacted detrimentally on the estate because certain of the monies paid by Anderson to USF & G were supposed to have been used to pay the expenses and development costs of Chicago Ridge. Tr. at pg. 360. The estate shared in the profits of Chicago Ridge, and the fact that these funds were not paid to the project reduced the estate's interest therein. Tr. at pg. 361. The conduct of USF & G was, once again, materially adverse to the creditors of the estate because the effect of its con-

duct was to materially enrich itself at the expense of the estate.

### Discovery

 The eighth instance cited by Ms. Goldstein concerned discovery issues. At the beginning of this case Ms. Goldstein and USF & G were jointly pursuing the discovery of assets of the estate. Tr. at pg. 362–363. They agreed to share information concerning the location of assets. Tr. at pg. 362–363. USF & G obtained information on the Florida 605 project which it failed to disclose to the Trustee. Tr. at pg. 363. When Goldstein called Moelmann to inquire why such information was not disclosed to her, he simply stated that he did not have enough information to tell her about it. Tr. at 364.

Also, Klein's former counsel, Lawrence Fisher, met with Goldstein and Moelmann in January 1989 in order to obtain additional information about pending matters in the action and to establish a relationship between the attorneys in the case. Tr. at pg. 789. Moelmann stated that USF & G wanted to make Klein an example in the construction industry, that USF & G was not concerned about the return of monies to the estate, and that USF & G was not interested in settling anything. Tr. at pg. 366 and 813.

It is certainly not difficult to see how such sabre-rattling by Moelmann, attorney for USF & G, could have proven irksome and perhaps even disheartening to the Trustee and Mr. Fisher. This Court has already pointed out that a creditor's advancing its own interests, without more, does not amount to a materially adverse interest.

It has also been pointed out that general unsecured creditors get the solicitude of the Code in being represented by a trustee, not because they are the "good guys" and everyone else is a "bad guy," but rather because they have no avenue to pursue their interests other than by maximizing the estate. This does not presuppose that the general unsecured creditors will constantly have their arms around one another. To the contrary, they are expected to advance their own interests, which happen to coincide with the estate's interests, as they see them, in a manner which is at once vigorous and potentially at odds with other general unsecured creditors and with the trustee. As long as a creditor does not pursue its separate recovery to the detriment and minimization of the estate, that creditor can have even violent disagreements as to strategy with other creditors and the trustee. This eighth instance cited by Goldstein, while adding some color to USF & G's activities, by itself amounts to no more than a robust disagreement as to strategy between Moelmann and Goldstein.

 It is true that Moelmann has gone to great lengths to rebut any adverse inferences to be drawn from his remarks, going so far as to disclaim authorization by USF & G to make those remarks. An agent's testimony as to the scope of his authority is of questionable weight. *See e.g., Moone v. Commercial Cas. Ins. Co.,* 350 Ill.App. 328, 112 N.E.2d 626 (1953) (competency under state law). Federal Rule of Evidence 601 grants competency to any witness with respect to a claim or defense, such as the one here involved, as to which federal law supplies the rule of decision, subject to determinations of relevancy, weight and sufficiency. The weight and sufficiency of Moelmann's testimony regarding his authority need not be decided, however, for even if he were fully authorized by USF & G to make the remarks he did, those remarks, in and of themselves, do not amount to a materially adverse interest.

 Goldstein also cites Moelmann's meetings with and attempts to settle adversary proceedings without informing Goldstein that such meetings were taking place. Tr. at pg. 370–373. This culminated in a face to face meeting wherein Goldstein demanded that Moelmann stop because he was causing confusion among the adversary defendants as to whether they should deal with the Trustee or USF & G. Tr. at pg. 375. Goldstein testified that this confusion caused an increase in the expenses incurred by the estate and delayed settlements. However, since Goldstein did not put a dollar figure on this effect this Court

concludes that any adverse impact was not material.

## RICO

■ The ninth item Goldstein simply called RICO. USF & G claims that it has a separate and independent RICO cause of action against the defendants in the adversary proceedings and against others. Tr. at pg. 376. This claim by USF & G has brought settlement negotiations with the adversary defendants to a halt. Tr. at pg. 378–380. They refuse to settle with the Trustee unless the settlement includes a release of this USF & G RICO claim. Tr. at pg. 378–380.

USF & G's conduct amounts to holding its RICO claim as a sword of Damocles over the heads of the adversary defendants, resulting in a chilling effect on their willingness to settle, and reducing the amount they would be willing to pay into the estate by the amount it costs them to settle separately with USF & G. Tr. at pg. 759–760. This is really a generalized instance of USF & G's behavior regarding the Stanton and Anderson settlements, leading in the same way to an increase in the estate's costs, and a decrease in the dividend to be paid to unsecured creditors. Tr. at pg. 380. The conclusion is therefore the same. This behavior reflects an adverse interest by USF & G.

USF & G argues that its assertions regarding RICO claims are not adverse since Goldstein has stated that, in her opinion, no viable separate RICO action exists in favor of USF & G. Tr. pp. 466–467, 722–723. It is not the nature of the estate's action that is determinative. The adversity results from the competing goals, i.e. collection by USF & G separately, to the detriment of the estate from the same source as would otherwise be available to the estate, regardless of whether the competing recoveries are based on the same or different causes of action. Here, by means of the RICO cause of action, which USF & G most assuredly believes it has separate and apart from the Klein estate, USF & G is competing in a real and demonstratively dollars and cents fashion, with the Klein estate for recovery, regardless of theory, from the same limited fund, the defendants. Therefore, the required adversity exists to a material extent.

## Trustee's Fees

■ The tenth instance dealt generally with the Trustee's attorney fees. Tr. at pg. 381. This category included USF & G's request of the Trustee to substantively consolidate the Klein and Klein Construction Company cases in June, 1989, shortly before the trustee election. Tr. at pg. 382–383. Moelmann made this request to the Harris Bank and Goldstein. Tr. at pg. 382–383. He indicated that, since Alan J. De-Mars had first been appointed the trustee in the Klein Construction Company case, he should be the trustee in the consolidated cases. Tr. at pg. 383.

Goldstein claims this exhibits an adverse interest because, if the cases had been consolidated, both the Klein and Klein Construction Company estates would be considered one entity. Tr. at pg. 384. Goldstein opposed the consolidation because creditors in the Klein case would have their dividend diluted if they had to share with the Klein Construction Company creditors on a pro rata basis. Tr. at pg. 384. It has not been demonstrated, however, what the total effect of pooling the assets of the two estates would be.

USF & G then requested a trustee election. Moelmann informed Goldstein on July 21, 1989, that he was going to request a trustee election and USF & G was going to vote for Obuchowski. Tr. at pg. 385. When informing her of this decision, he said that if she did not object to the request for an election, USF & G would come to terms with her on her fee requests. Tr. at pg. 385 and 389. Moelmann had previously threatened her fees in this case in the summer of 1988 when Goldstein and he had a disagreement on another issue in the case. Tr. at pg. 388–389.

The final element of what was generally defined as threats on attorney fees concerned USF & G's insistence that Goldstein would remain as the Trustee only by keeping a few of the adversary proceedings and

would otherwise discharge her duties. Tr. at pg. 1115. In February, 1989, Moelmann informed Goldstein that, pursuant to this agreement, she could not attend any depositions in the case or attend any of the settlement conferences which would be held with adversary defendants. Tr. at pg. 1115. In essence, Moelmann wanted to take control of the case.

While the Court might have preferred that the relationship between trustee and counsel was less abrasive and more conciliatory, this is not the first time that a creditor's attorney has pushed hard for his client and it will not be the last. In the absence of a dollar and cent effect on the estate, which has not been shown, Moelmann's behavior in this instance may very well be adverse to Goldstein, but it is not materially adverse to the estate.

Prior to the evidentiary hearing, USF & G filed a Statement of Position. In that Statement, USF & G stated that *in the event Obuchowski was confirmed* it would share any *future* RICO recoveries with all unsecured creditors. This Statement thus actually militates *against* USF & G's position that (1) it has always been willing to share with other creditors because it relates only to future recoveries and (2) that it maintains no interest adverse to the Trustee because it is conditional on USF & G getting its way on the trustee election.

In summary, this Court agrees with the Trustee that USF & G has demonstrated a pattern of materially adverse interest. One or more of those instances may be sufficient by themselves to support a finding that USF & G holds an interest materially adverse to creditors of the estate under § 702(a)(2). The combined effect is to clearly prove, to this Court, that USF & G, as a matter of fact, is materially adverse to the interests of the general unsecured creditor class.

*Conclusion*

As a result of all the foregoing, this Court concludes that USF & G is disqualified from voting for the trustee in the Klein estate and denies its motion to confirm the election of Mr. Obuchowski as

trustee. Since no new Trustee has been elected, the Interim Trustee under Section 702(d) becomes the Permanent Trustee, and Ilene Goldstein is therefore the Chapter 7 Trustee.